UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ELI ERICKSON,<br>a/k/a Black,<br><br>Defendant. | 3:18-CR-30148-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION FOR ACQUITTAL<br>OR NEW TRIAL |

Eli Erickson was indicted for conspiracy to distribute methamphetamine and on six additional counts involving firearms offenses. Docs. 1, 57. This Court conducted a jury trial between November 5 and November 7, 2019. The jury returned a verdict finding Erickson guilty of conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine. Doc. 108. The jury found Erickson guilty of some firearms offenses and not guilty on other firearms offenses. Id.

Erickson then filed a motion for acquittal or in the alternative for new trial. Doc. 118. The government opposes the motion. Doc. 122. Erickson makes five arguments to claim entitlement to acquittal or new trial: 1) a violation of his speedy trial rights; 2) an absence of a jury of his peers, asserting underrepresentation of Native American jurors; 3) alleged newly discovered evidence; 4) error in allowing a witness allegedly under the influence of drugs to testify; and 5) a verdict contrary to the great weight of evidence, particularly focused on the credibility of Witness C and

the alleged absence of sufficient proof of an agreement or common purpose to establish a conspiracy.

Because of the nature of Erickson's challenge to the method of jury selection in the District of South Dakota, this Court ordered the Clerk of Court to file in this case the District of South Dakota's approved jury plan and information concerning the racial makeup of the panel of jurors reporting for Erickson's jury trial. Doc. 123. The Clerk of Court did so through the filing of an affidavit and attachments. Doc. 124. Erickson has filed nothing further to argue any inadequacy in the jury plan. Because one of Erickson's arguments raised a potential <u>Brady</u> issue in asserting newly discovered evidence, this Court ordered that the government submit for in camera review certain audio recordings and written reports of those interviews. Doc. 125. This Court now has conducted its in camera review of that material. For the reasons explained below, this Court denies Erickson's motion for acquittal or in the alternative new trial.

## I.      Summary of Facts Relevant to Issues Raised by Erickson's Post-trial Motion

On November 14, 2018, Erickson was indicted as the lone defendant in a seven-count indictment. Doc. 1. Count 1 of the indictment alleged conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. Count 2 of the indictment alleged that Erickson had possessed six different firearms in relation to a drug trafficking crime. Count 3 alleged that Erickson had illegally possessed a short-barreled shotgun. Count 4 alleged that Erickson had possessed a shotgun with an obliterated serial number. Count 5 alleged that Erickson had possessed six different firearms at a time when he was an unlawful user of and addicted to a controlled substance. Counts 6 and 7 alleged possession on particular dates of a rifle and a pistol respectively at a time when Erickson was an unlawful user of and addicted to a controlled substance.

Criminal Justice Act (CJA) panel attorney Terra Fisher was Erickson's original court-appointed attorney. Doc. 10. Consistent with the Speedy Trial Act, this Court entered an early Scheduling and Case Management Order setting a jury trial for January 22, 2019. Doc. 16. In late December of 2018, Erickson sought to have different counsel appointed for him, and Magistrate Judge Mark A. Moreno met with Erickson and attorney Fisher in chambers on January 4, 2019. Magistrate Judge Moreno thereafter denied Erickson's request for substitute counsel. Doc. 26. Fisher, on behalf of Erickson, made a motion to continue the jury trial. Doc. 30. Erickson signed a consent to a continuance indicating that he had been advised of his speedy trial right and consented to postponement of the trial. Doc. 29. This Court granted the motion to continue, resetting the jury trial for April of 2019. Doc. 30. Meanwhile, Erickson's disagreements with Fisher continued, resulting in another motion to withdraw, which Magistrate Judge Moreno granted on January 11, 2019. Docs. 31, 33.

Erickson's next appointed counsel was CJA panel attorney Jeffrey Banks. Understandably, Banks filed a motion for continuance on behalf of Erickson after he had to postpone two meetings with Erickson due to the weather[1] and had not reviewed the discovery with Erickson. Doc. 39. Erickson signed a consent again indicating that he had been advised of his Speedy Trial Act rights. Doc. 38. This Court granted a continuance and set the jury trial for July 23, 2019. Doc. 45.

On June 25, 2019, Banks on behalf of Erickson filed another motion for continuance, indicating that he was still receiving discovery from the government and was requesting funds for a private investigator to assist in locating and interviewing witnesses. Doc. 46. Erickson signed another consent acknowledging that he had been advised of his speedy trial rights and waived the

---

[1] Attorney Banks offices in Huron, South Dakota, and Erickson was detained pending trial more than an hour's drive from Huron. There were several snow storms in central South Dakota during the first few months of 2019.

period of time of the continuance under the Speedy Trial Act. Doc. 47. By July, Erickson was dissatisfied with Banks, and Magistrate Judge Moreno held a hearing on July 1, 2019, to hear from Erickson and Banks, thereafter denying Erickson's request for new counsel. Docs. 49, 50. This Court granted the continuance requested by Banks and Erickson and set the jury trial for September 24, 2019. Doc. 51.

On September 10, 2019, the government filed a superseding indictment, making somewhat modest changes to the original indictment. Doc. 57. Erickson's disgruntlement with Banks continued, so Magistrate Judge Moreno held another hearing to consider Erickson's ex parte motion for new counsel and denied the motion. Docs. 60, 61. On the heels of the denial of new counsel, Banks filed another motion for continuance indicating that he was still preparing for trial and that the work of the private investigator was ongoing. Doc. 62. Erickson signed a consent to that motion for continuance, similar in content to what had been filed previously as his consents. Doc. 63. This Court granted the motion for continuance setting the trial to begin on November 5, 2019. Doc. 64.

In October, Banks sought to withdraw because his attorney-client relationship with Erickson was "irrevocably broken." Doc. 67. Magistrate Judge Moreno granted the motion to withdraw, Doc. 68, and appointed CJA panel attorney John Rusch, Doc. 71. Rusch was the trial counsel for Erickson during the trial that took place from November 5 through 7, 2019.

This Court summoned jurors consistent with the approved Plan for Random Selection of Grand and Petit Jurors in effect in the District of South Dakota pursuant to the Jury Selection and Service Act of 1968. See Doc. 24 at 5–18. Both the government and Rusch were allowed access to the jury qualification questionnaires for the jurors. See Doc. 78; Doc. 124 at 3–4 (blank Juror Qualification Questionnaire used in the District of South Dakota). Fifty-one qualified jurors

reported for service for Erickson's trial on November 5, 2019. Of that number, nine identified their race as "American Indian/Alaskan Native" on the Juror Qualification Questionnaire. Doc. 124. That is, 17.6% of the pool of qualified jurors for Erickson's trial were of Native American ancestry. Erickson and most of the government's witnesses were of Native American ancestry.

Forty-nine of the summoned fifty-one prospective jurors were questioned as this Court sought to have 31 jurors passed for cause in order to empanel a jury of thirteen individuals (twelve who deliberate, with one alternate). Of those forty-nine prospective jurors questioned by the Court and counsel, eight of them had identified their race as "American Indian/Alaskan Native." Doc. 124. Thus, 16.3% of those questioned during voir dire were of Native American ancestry. By happenstance of the random draw, of the two people reporting for jury service but not questioned, one was Native American. After both the government and Erickson passed a group of 31 potential jurors for cause, this Court excused those two remaining people who had reported for jury duty.

As this Court recollects, six of the otherwise qualified Native American jurors were excused for cause during voir dire with neither the government nor Erickson objecting. Some of the prospective Native American jurors knew Erickson or potential witnesses, and indeed one of the prospective Native American jurors indicated that she knew what Erickson had done. As Erickson's counsel noted on the record during the trial, this Court was reluctant to excuse Native American jurors for cause and noted the importance of having Native American jurors on the panel. There were only two Native American jurors remaining among the thirty-one that counsel passed for cause prior to peremptory challenges being exercised. The government exercised one peremptory challenge on a Native American and Erickson exercised one peremptory challenge on a Native American.

After this Court read the names of the thirteen jurors selected to hear the evidence and excused all remaining jurors, Erickson's counsel asked to approach. At sidebar, Erickson's counsel made an argument about the absence of Native American jurors and referenced Batson v. Kentucky, 476 U.S. 79 (1986). After noting that a Batson challenge should have been raised prior to excusing all remaining jurors, this Court nonetheless heard from the government on what it proffered as a legitimate nondiscriminatory reason for exercising a peremptory challenge on one Native American juror. After the reason was given, Erickson's counsel chose not to argue pretense, and this Court denied the Batson challenge concluding that the government had a legitimate nondiscriminatory reason to exercise a peremptory challenge on that particular juror. Erickson's counsel, however, made an argument at sidebar akin to what is made in the post-trial motion about a systematic problem of underrepresentation of Native Americans on juries in the District of South Dakota. This Court proceeded with the jury trial.

Eight different witnesses testified about Erickson's involvement with methamphetamine on the Rosebud Indian Reservation. The first such witness whom the Government called was Witness C,[2] who is serving a 25-year sentence for conspiracy to distribute methamphetamine. Witness C said that Erickson was like a brother to her and was solemn and emotional during her testimony. Witness C testified that she obtained large quantities of methamphetamine in Lexington and Kearney, Nebraska, and elsewhere. Witness C was living in Nebraska and dating a man with connections through which he purchased many pounds of methamphetamine, which Witness C helped distribute. Witness C, who was from Rosebud, delivered methamphetamine to Erickson on the Rosebud Indian Reservation beginning in 2015 and continuing until she was

---

[2] This Court filed a sealed opinion and order using the witnesses actual names, but in this unsealed opinion and order seeks to protect witnesses who cooperated with the government by using pseudonyms.

imprisoned in late 2015. On the first such occasion, Witness C brought methamphetamine to Erickson's home in South Antelope and sold three ounces (approximately 85 grams) of methamphetamine from Erickson's home. Witness C testified that she took approximately 20 trips from Nebraska to sell methamphetamine on the Rosebud Indian Reservation. After her first trip, she typically brought 1 to 3 pounds of methamphetamine to South Dakota on each trip, and the largest quantity she brought at any one time was between 8 to 12 pounds of methamphetamine. She typically split half of what she brought to South Dakota with Erickson, selling the rest herself sometimes from Sunrise Apartments in Mission and sometimes in Rapid City. Using Witness C's most conservative estimate of 1 pound per trip on 20 trips, split evenly with Erickson, the drug quantity attributable to Erickson based on Witness C's testimony is at least 4535.9 grams (10 pounds x 453.59 grams/pound). Witness C typically fronted methamphetamine to Erickson, and Erickson gave her what he earned from the sales, sometimes about $3,000 per pound. Witness C saw Erickson distribute methamphetamine to at least three other individuals. Witness C brought Erickson guns and personally gave him one gun. Witness C testified that Erickson always carried a gun for protection. Witness C saw Erickson smoke methamphetamine, but knew Erickson to use marijuana more frequently than methamphetamine.

Witness R testified that he was a friend of Erickson's entire family and bought from and sold methamphetamine to Erickson a couple of times in the 2014 to 2015 time period. Witness R recalled buying two to three ounces (56.7 to 85 grams) of methamphetamine from Erickson over the years and described Erickson as a "small time guy." The largest quantity of methamphetamine Witness R saw in Erickson's possession at any one time was two ounces. Witness R saw Erickson distribute methamphetamine to others at times and used methamphetamine with Erickson occasionally. Witness R saw firearms in and around Erickson's home, but did not know whether

they belonged to Erickson or to Erickson's brother or father. Witness R saw Erickson with a shotgun once. Witness R is serving a 120-month sentence for conspiracy to distribute methamphetamine and received his methamphetamine primarily from Denver.

Witness MB, who is serving a 120-month sentence for conspiracy to distribute methamphetamine, testified that Erickson bought methamphetamine from him in November and December of 2017. Erickson came multiple times in a week, buying half an ounce to one ounce on each occasion. Witness MB estimated that Erickson bought a total of approximately 10 ounces (283 grams) of methamphetamine, paying $1,000 to $1,100 per ounce. On one occasion at Erickson's home, Witness MB saw two ounces of methamphetamine in a bag on a counter and smoked methamphetamine with Erickson in his home. Witness MB saw Erickson with a shotgun in November of 2017, when Erickson tried to trade the shotgun for methamphetamine.

Witness TE, who is serving a 30-month sentence, dealt methamphetamine for Witness MB. Witness TE knows Erickson's "baby momma" Jaylen LaPointe. Witness TE sold 2 grams of methamphetamine for $175 to LaPointe when Erickson was present, but that was Witness TE's first time meeting Erickson.

Witness AB testified that she bought methamphetamine from Erickson in 2017. Witness AB twice purchased .5 grams (a 50-bag), for a total of one gram from Erickson. Witness AB bought those "50-bags" from a window on the side of Erickson's home. Witness AB saw Erickson in the bedroom smoking what appeared to be methamphetamine out of a lightbulb.

Witness W, who is serving a 120-month sentence for conspiracy to distribute methamphetamine, met Erickson at the end of 2014 and bought methamphetamine from Erickson in 2014 or 2015. Witness W purchased a couple of "eight-balls" (3.5 grams of methamphetamine each), paying between $300 and $450 for each eight-ball. To purchase methamphetamine, Witness

W would drive to Erickson's home, and Erickson would come out and deliver the methamphetamine to Witness W's female companion. Witness W used methamphetamine with Erickson at Witness R's home on one occasion. Witness W saw Erickson with a pistol in South Antelope.

Witness G, who had served a federal drug sentence as well, knew Erickson from middle school, but never dealt directly with Erickson on buying or selling methamphetamine. Witness G conspired to distribute methamphetamine with her then-boyfriend RGJ. Witness G made trips with RGJ, including to Erickson's home in South Antelope, to deliver methamphetamine in 2015 and 2016. Witness G would wait in the car while RGJ would deliver methamphetamine into Erickson's home. RGJ would return with over $100 and sometimes more than $1,000, and at other times with weapons, including firearms, after having gone into Erickson's home.

On October 22, 2016, Rosebud Sioux Tribe (RST) law enforcement responded to a call concerning gun fire at Erickson's home in South Antelope. Law enforcement originally suspected that Erickson was the shooter, although he was not. RST law enforcement, together with an FBI special agent, ultimately obtained a search warrant and searched Erickson's home on October 22, 2016. The search yielded pipes used for smoking methamphetamine, torches, ammunition, and two guns found in a bedroom where the first names of Erickson and his girlfriend were written on the wall. The jury convicted Erickson of offenses involving possession of those two firearms. Law enforcement found four additional firearms in an old Ford Mustang car located in the yard just a few feet behind Erickson's residence. Testimony during the trial suggested that those guns may have belonged to Erickson's brother, who had passed away earlier during the month of October of 2016. The jury did not convict Erickson on any offenses involving the firearms in the Mustang.

RST law enforcement on June 3, 2018, executed a tribal search warrant on Erickson's home after a shooting where the shooter told law enforcement about obtaining the gun from Erickson. Law enforcement located a disassembled gun in a bucket in Erickson's home. Erickson was convicted by the jury on counts concerning this disassembled gun, which testimony established to qualify as a firearm under federal law. Law enforcement on June 3, 2018, also seized needles and baggies from Erickson's home that tested positive for methamphetamine residue.

On September 6, 2018, RST law enforcement officer Joshua Marti attempted to contact three individuals walking near Sunrise Apartments in Mission after Officer Marti observed the three behaving suspiciously. Erickson was one of two males who took off running to evade Officer Marti. Erickson jumped a fence and crouched near a pickup truck. As Officer Marti approached, Erickson fled from hiding near the pickup truck and dropped approximately $300 of cash out of his pocket before being apprehended. RST Special Agent Frank Iron Heart later found a handgun in the grill of the pickup truck where Erickson had been hiding.

Erickson testified during his jury trial, stating that he was unaware of any drugs in his home or of any guns in the Mustang located behind his home in October of 2016. Erickson denied that Witness C delivered methamphetamine to him and denied that he had any agreement with Witness C whom he characterized as a very heavy drug user. Erickson stated that he does not own a gun because he gets pulled over by cops a lot. Erickson denied knowing many of the individuals who testified and denied selling methamphetamine or setting up deals to sell methamphetamine. During a surprisingly terse and tepid cross-examination, Erickson testified that he never told Deputy Sheriff Dustin Baxter that he sold methamphetamine or set up deals to sell methamphetamine. Erickson on cross-examination also denied trying to get Witness JS to sell methamphetamine for him.

In the government's rebuttal case, Witness JS testified that Erickson tried to get Witness JS to sell methamphetamine for him in South Antelope in 2015. Witness JS also testified that he bought a couple "20s" ($20 bags of methamphetamine) from Erickson on four or five occasions at Erickson's home between June and August 2015. Witness JS saw seven or eight ounces (198.45 to 226 grams) of methamphetamine on the table in Erickson's home when he was there. At trial, Erickson's counsel insisted that Witness JS appeared to be under the influence as he testified and that the jury should have been instructed to disregard his testimony. This Court did not see anything in Witness JS's demeanor to suggest that he was under the influence. Witness JS had been picked up on a material witness warrant the previous evening and had spent the night before testifying in United States Marshal Service custody. Nevertheless, this Court allowed defense counsel to ask Witness JS in the presence of the jury whether he was willing to undergo a urine test, and Witness JS answered that he was not. This Court declined to instruct the jury to disregard Witness JS's testimony altogether, but in no way impeded defense counsel from arguing that the jury should somehow discount or disregard Witness JS's testimony based on his demeanor or other instructions this Court gave about evaluating witness credibility.

As a part of the government's rebuttal case, to refute Erickson's testimony that he never told Deputy Sheriff Baxter that he sold or set up deals for methamphetamine, Deputy Sheriff Baxter testified that he interviewed Erickson in September of 2005 in Nebraska. Erickson said during the interview that he set up methamphetamine deals and sold methamphetamine to another person. This Court instructed the jury to consider the testimony about Erickson's statements in 2005 (which was well outside the time frames alleged in the superseding indictment) only to assess Erickson's credibility.

The jury found Erickson guilty on Count 1 for conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. The jury found Erickson guilty on Count 2 with respect to the two firearms located in his bedroom on October 22, 2016—an Amadeo Rossi Sociedade Anomina, model R92, .357 magnum caliber rifle; and a Remington Arms Company Incorporated, model 1100, 12-gauge shotgun—finding them to be used in furtherance of drug trafficking. The jury found Erickson not guilty on Count 2 with respect to four other firearms that had been seized from the Mustang parked behind his home in October of 2016. The jury found Erickson not guilty of Counts 3 and 4, which were counts related to two of the firearms found in the Mustang behind his home. The jury found Erickson guilty on Count 5 for the crime of being a drug user in possession of firearms based on possession of the same two firearms found in his bedroom, though he was found not guilty on Count 5 regarding the four firearms found in the vehicle behind his home in October of 2016. The jury found Erickson guilty on Counts 6 and 7 for drug user in possession of a firearm for a Armi Jager, .22 caliber rifle taken from his home on June 3, 2018, and for a Beemiller Incorporated, Hi-Point brand name Model C9, 9x19mm Luger caliber pistol found in the grill of a pickup where Erickson had hidden from police on September 6, 2018.

Erickson's conviction for conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine indicates that the jury probably believed the testimony of Witness C. If the jury had not believed the testimony of Witness C, the drug quantity of conviction still could have been above 500 grams of methamphetamine based on the remaining witness testimony.

## II.    Discussion of Grounds Raised in Erickson's Motion

### A. Standard for Granting Judgment of Acquittal or New Trial

"A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." United States v. Dupont, 672 F.3d 580, 582 (8th Cir. 2012) (quoting United States v. Boesen, 491 F.3d 852, 855 (8th Cir. 2007)). In ruling on a motion for judgment of acquittal, the court must view the evidence "in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." Id. at 582 (quoting United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006)). Of course, "a jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010).

Erickson's post-trial motion does not mention his conviction on the firearms offenses. Rather, he makes some arguments about one witness in particular, Witness C, not being credible and there being no evidence of an agreement or common purpose for there to be a conspiracy. In short, Erickson's arguments for acquittal relate to his conviction on Count 1 involving conspiracy to distribute methamphetamine. "To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; ... (3) that the defendant intentionally joined in the conspiracy;" and for a conviction here (4) that the conspiracy involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. United States v. Sanchez, 789 F.3d 827, 834 (8th Cir. 2015) (quoting United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011)). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." United States v. Green, 835 F.3d 844, 850 (8th Cir. 2016) (quoting Sanchez, 789 F.3d at 834).

The standard for a new trial under Rule 33 of the Federal Rules of Criminal Procedure is different. Rule 33 allows the court to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). When evaluating a motion for a new trial on the basis of insufficient evidence, "the district court is not required to view the evidence in the light most favorable to the verdict; instead, [it] may weigh the evidence and judge witness credibility for itself." United States v. Clayton, 787 F.3d 929, 935 (8th Cir. 2015). However, a "jury's verdict must be allowed to stand unless 'the evidence weighs heavily enough against the verdict [such] that a miscarriage of justice may have occurred.'" Id. (alterations in original) (quoting United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir. 2007)); see United States v. Stacks, 821 F.3d 1038, 1044 (8th Cir. 2016) ("Motions for new trials based on the weight of the evidence are generally disfavored."). The power of the court to grant a new trial should be invoked only in an exceptional case where the evidence preponderates heavily against the verdict. United States v. Starr, 533 F.3d 985, 999 (8th Cir. 2008). "As a general rule, the decision whether to grant or deny a motion for a new trial lies within the discretion of the district court." United States v. McMahan, 744 F.2d 647, 652 (8th Cir. 1984). Such authority, however, "should be exercised sparingly and with caution." United States v. Cole, 537 F.3d 923, 926 (8th Cir. 2008) (citation omitted).

## B. Erickson's Arguments in Post-Trial Motion

### 1. Alleged Speedy Trial Right Violation

Rule 12(b)(3)(A)(iii) of the Federal Rules of Criminal Procedure provides that "a violation of the constitutional right to a speedy trial" must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits. A defendant forfeits a right when he fails "to make the timely assertion of [the] right." United States v. Olano, 507 U.S. 725, 733 (1993).

Erickson's argument is that he believes he never truly consented to any continuances besides the initial continuance. However, as set forth in the facts section, there are consent forms signed by Erickson that accompanied each of the motions for continuance. Erickson's current counsel asserts that he was advised by Erickson that Erickson did not sign certain of the consent forms and avers that the last three signatures of Erickson appear to him to be different than the first two. To this Court's eye, all of the signatures on the consent forms appear to be substantially similar. Erickson has not even bothered to file an affidavit or any evidence that it was not he who signed the consent forms.

Even if somehow Erickson did not sign some of the consent forms, this argument of a violation of the Speedy Trial Act was known to Erickson before the trial. Erickson failed to file any motion invoking the Speedy Trial Act until after he was convicted, and his argument now is untimely under Federal Rule of Criminal Procedure 12(b)(3)(A)(iii). Erickson does not have grounds for acquittal or new trial based on his speedy trial right argument.

### 2. Alleged "inherent flaw" in Jury Selection Process

Erickson's argument about the alleged "inherent flaw in the jury selection process in South Dakota" is encapsulated in the following paragraph:

> There appears to have developed a system of jury selection in South Dakota which has the effect of excluding Native Americans from the jury pool despite the Court's best efforts at inclusion. First, the undersigned would commend the Court for the efforts and lengths to which the Court attempted to insure that Native American jurors were on the initial jury pool and were not struck for cause. The problem however may be inadvertently built into the South Dakota jury selection system in such a way that larger drug cases will always exclude Native American jurors.

Doc. 118 at 6 (defense argument regarding "inherent flaw in jury selection process").

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975). That is, a jury must

"be a body truly representative of the community." Smith v. Texas, 311 U.S. 128, 130 (1940). "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. However, neither statute nor the Sixth Amendment requires precise proportional representation of minority groups on jury panels. Swain v. Alabama, 380 U.S. 202, 208–09 (1965), overruled on other grounds by Batson, 476 U.S. at 95–96.

To show a prima facie case of a violation of the Sixth Amendment right to a fair jury due to underrepresentation of Native Americans, Erickson must satisfy the three-part test set forth by the Supreme Court of the United States in Duren v. Missouri:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. 357, 364 (1979). Without question and for reasons apparent from the attached Timeline of Native American History and Indian Law,[3] Native Americans are a "distinctive" group in the community under the first element of the Duren test. United States v. Yazzie, 660 F.2d 422, 426 (10th Cir. 1981).

_____

[3] The Undersigned wrote the Timeline of Native American History and Indian Law when working on the Tribal Issues Advisory Group to the United States Sentencing Commission. The Timeline was submitted with the final report of the Tribal Issues Advisory Group with the goal of providing the Sentencing Commission with historical context for the report. Since that time, a couple of federal government agencies and Indian law professors have asked (and been granted permission) to use the report for teaching purposes. The Timeline has not otherwise been published previously; the undersigned has no interest in copyright protection and simply hopes that the Timeline— though necessarily oversimplifying Native American History and Indian Law—is of some use in understanding the context for this decision and perhaps otherwise as a pedagogical tool.

The second element of the <u>Duren</u> test requires that the "representation of [the] group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." The Supreme Court of the United States in <u>Swain v. Alabama</u>, determined that an underrepresentation of as much as ten percent as calculated by the "absolute disparity concept" does not constitute prima facie evidence of underrepresentation. 380 U.S. at 208–09. The United States Court of Appeals for the Eighth Circuit has used the "absolute disparity calculation" in evaluating whether there is prima facie evidence of underrepresentation of Native Americans on District of South Dakota petit juries. <u>United States v. Clifford</u>, 640 F.2d 150, 154–56 (8th Cir. 1981). "Under the absolute disparity calculation, the percentage of Indians on the list of persons eligible for petit jury service is subtracted from the percentage of Indians in the general population, resulting in a figure constituting the absolute difference." <u>Id.</u> at 155. At the time of the <u>Clifford</u> decision, Native Americans living within the Central Division constituted 15.6% of the total population and 8.4% of the jurors sitting on petit juries, so the absolute disparity calculation was 7.2% (15.6% minus 8.4% equals 7.2%). <u>Id.</u> at 154–55. The Eighth Circuit in <u>Clifford</u> rejected the appellant's argument for "comparative disparity" statistical calculation and applied the "absolute disparity" calculation instead. <u>Id.</u> at 155. The Eighth Circuit in <u>Clifford</u> held the 7.2% absolute disparity not to establish prima facie evidence of underrepresentation of Native Americans on petit juries in the Central Division of the District of South Dakota. <u>Id.</u>

As set forth in the Affidavit of Matthew Thelen Clerk of Court, Doc. 124, the percentage of Native Americans according to 2015 Census Bureau population data is 25% in the Central Division of the District of South Dakota, and 7.1%. in the state of South Dakota as a whole. Of the fifty-one jurors reporting for jury service for Erickson's trial on November 5, 2019, nine of those individuals (17.6%) identified themselves as "American Indian/Alaska Native" on their jury

questionnaires. Doc. 124. Thus, the absolute disparity calculation using the jurors reporting for jury service for Erickson's trial is 7.4% (calculated as 25% minus 17.6%). This is nearly an identical absolute disparity percentage (7.4% versus 7.2%) that the Eighth Circuit in Clifford found "does not represent substantial underrepresentation."[4] Clifford, 640 F.2d at 155.

The final element for a prima facie case under the Duren test requires a showing that any underrepresentation is due to systematic exclusion of the distinctive group in the jury selection process. Duren, 439 U.S. at 364. The District of South Dakota, as it did back in 1981 at the time Clifford was decided, uses voter registration lists from which to randomly draw jurors. The Eighth Circuit in Clifford noted that "[t]he use of voter registration lists in almost every instance provides each qualified citizen an equal opportunity to be selected in random drawing to serve on a petit jury." Clifford, 640 F.2d at 156. The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–69, requires jurors to be randomly selected from voter registration lists or the lists of actual voters of the political subdivisions within the district and is intended to eliminate discriminatory and arbitrary selection practices to ensure a representative cross section of the community. 28 U.S.C. § 1863(b)(2). The District of South Dakota has ensured a random selection of jurors through its formal Jury Plan. The Jury Plan filed by the District of South Dakota has been approved at the

---

[4] Erickson's brief cites to a research report by Professor Richard Braunstein, who relied on a Rapid City attorney named Stephen Demik to conclude that Native Americans comprised 24% of the Western Division's adult population but only 6% of the Western Division's pool in 2013. This information apparently was included in a Rapid City Journal article on July 7, 2019, to which Erickson cites. There are two major problems with Erickson's argument. First, Erickson's trial was in the Central Division of the District of South Dakota and not in the Western Division. Second, the information Professor Braunstein reportedly drew from Attorney Demik is flat wrong; the Western Division, as set forth in the Affidavit of Matthew Thelen Clerk of Court, has 11% (and not 24%) of its population being of Native American ancestry. If Attorney Demik was correct that 6% of the Western Division's jury pool in 2013 was Native American, the underrepresentation of Native Americans in the Western Division jury pool was 5% under the "absolute disparity" measure.

Circuit level. Even if Erickson had made a prima facie showing of underrepresentation of Native Americans in his jury pool or any other, Erickson has not shown that any alleged underrepresentation is due to systematic exclusion of Native Americans in the jury selection process in the District of South Dakota.

This Court is not oblivious to the unique challenges to achieving adequate representation of Native Americans on jury panels in the Central Division of the District of South Dakota. First, there is the combined issues of poverty and distance from many reservation communities to the Central Division courthouse in Pierre. When the undersigned wrote the attached Timeline of Native American History to give the Sentencing Commission the context for the Tribal Issues Advisory Group's report, five of the poorest eleven counties in the United States were Indian country counties in South Dakota. Four of those counties—Buffalo, Dewey, Ziebach, and Todd counties[5]—are in the Central Division of South Dakota and comprise portions of the Crow Creek Indian Reservation, Cheyenne River Indian Reservation, and Rosebud Indian Reservation. Three of the four reservations located in the Central Division of the District of South Dakota are the remnants of the Great Sioux Indian reservation lands deemed unsuitable to be carved up for homesteads under the Dawes Act; the land tends to be of limited agricultural use and remote from population centers. Impoverished people regardless of their race often struggle with reliable transportation, and many reservation communities are distant from Pierre. For instance, the most populous towns on the Cheyenne River Indian Reservation—Eagle Butte, Dupree, and Timber Lake—are 104, 107, and 134 miles northwest of Pierre respectively. The five most populous towns on the Rosebud Indian Reservation—White River, Mission, Rosebud, Parmelee, and Saint

---

[5] The fifth such county is Oglala Lakota (formerly Shannon) County, which comprises the bulk of the Pine Ridge Indian Reservation in the Western Division of the District of South Dakota.

Francis—are 80, 101, 108, 118, and 116 miles southwest of Pierre respectively. There exists no public transportation in rural South Dakota and weather and road conditions during certain months complicate travel. This Court frequently reads responses to jury questionnaires from those who live on reservations about having no transportation or no ability to pay for gas if they have a car. To combat this, this Court, long before Erickson's trial, began advancing the daily jury fee and mileage to those (both Native American and non-Indian) who cannot otherwise make it to Pierre for jury service. Furthermore, before Erickson's trial, the Clerk of Court contracted with River City Transit, a Pierre business, to pick up and transport people from reservation towns to Pierre for jury service when they otherwise lack transit.

This Court also is very aware from reading jury questionnaire responses through the years of what appears to be increasing hostility to the federal government and in turn jury service in central South Dakota, primarily from non-Indian jurors. Some Native Americans in South Dakota likewise express on their responses to jury questionnaires dissatisfaction about the federal government for understandable reasons, some of which are explained in the attached Timeline. In the District of South Dakota, the vast majority of criminal cases involve Native American defendants and witnesses with the indicted behavior having occurred on reservations and often involving Native American victims. The tribes in South Dakota are not subject to Public Law 280, there is no state jurisdiction over "Indians" in "Indian country" in South Dakota, the tribes lack the power to punish anyone for greater than one year (unless certified under the Tribal Law and Order Act which none of the four tribes in the Central Division presently are), and thus felony cases involving Native American defendants or victims in South Dakota's "Indian country" land in federal court. As a consequence, many Native American jurors from Central Division reservations know of people, sometimes family members, who have been defendants or victims in

cases charged in federal court. The outcomes and perceptions about whether justice resulted from those cases can affect responses from prospective Native American jurors on the jury questionnaire and during voir dire. Moreover, because the vast majority of criminal cases in the Central Division involves reservation crime, prospective Native American jurors are more likely to know the defendant, witnesses and victims than non-Indian jurors. This seems to be what Erickson has in mind when arguing about some "inherent flaw" in the jury selection system in the Central Division of the District of South Dakota.

Erickson's argument overlooks that there are four separate reservations in the Central Division. In Erickson's case, jurors from the Rosebud Indian Reservation knew Erickson or witnesses. But that leaves jurors from the Cheyenne River Indian Reservation, Crow Creek Indian Reservation, and Lower Brule Indian Reservation. In fact, despite the vast majority of federal criminal cases in the Central Division arising from reservations, Erickson's all-white jury (after eight Native American jurors were excused for cause or by peremptory challenges) is an anomaly; Central Division petit juries almost always have at least one, not uncommonly two, and occasionally three Native Americans among the twelve who deliberate.

Nevertheless, with most defendants, fact witnesses and victims in Central Division criminal cases being Native American, and with the ideal ratio of Native Americans on petit juries being three of twelve, this Court has contemplated whether there might be a way of revising this Court's jury plan to supplement the jury wheel beyond using the voter registration information. After all, with the weakening of the two-party system in South Dakota over the last two decades and the dominance of a single political party, South Dakota has moved toward purging of voter registration lists of infrequent voters and away from the era when the minority party in South Dakota had organized voter registration drives on reservations. This Court has considered the possibility of

augmenting the list of registered voters with those who have driver's licenses within the state of South Dakota, but has determined that doing so would likely dilute the numbers of Native Americans reporting for jury service. After all, a Native American in South Dakota is not necessarily required to have a South Dakota driver's license to drive on a reservation. State law generally does not apply to Native Americans on reservations in South Dakota because no South Dakota tribe is subject to Public Law 280. Accordingly, augmenting the jury wheel with driver's license lists almost certainly would result in a higher percentage of non-Indians and in turn a lower percentage of Native Americans on District of South Dakota juries. This Court of course cannot violate the randomness requirement of the Jury Selection and Service Act by somehow prioritizing Native Americans on lists or juries. See 28 U.S.C. § 1861. In short, there is no systematic exclusion under Duren, and this Court has done all it reasonably can to promote service by Native Americans on petit juries in the Central Division.

### C. Newly Discovered Evidence

Erickson next argues that he should be granted a new trial because evidence concerning two debriefs of Witness C were not disclosed to the defense. Specifically, Erickson believes those debriefs contain information that would contradict Witness C's testimony at trial and would be exculpatory in nature. "Motions for a new trial based on newly discovered evidence are disfavored." United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001). Such motions will typically only be granted if (1) the evidence is in fact newly discovered; (2) there was no lack of diligence by the movant; (3) the new evidence is not merely cumulative or impeaching; (4) it is material to the issues involved; and (5) it would likely produce an acquittal if a new trial was granted. United States v. Castillo, 171 F.3d 1163, 1167 (8th Cir. 1999). "Due diligence requires that a defendant exert some effort to discover the evidence." Id. (citation omitted).

Erickson's motion asserted that while in custody after his trial he learned from a cellmate of additional debriefs of the government's witness Witness C which were not disclosed to defense counsel. The government responded that it provided defense counsel with all of the written reports of Witness C's interviews, but acknowledged that it failed to disclose to Erickson's counsel two of the audio recordings associated with those reports until after trial. This Court therefore ordered the government to file those two audio recordings and their corresponding written reports under seal for in camera review. After the government filed those materials, this Court conducted an in camera review. Based on that review, this Court has determined that Erickson is not entitled to a new trial based on newly discovered evidence.

First, it is unclear whether the audio recordings are truly "newly discovered." The written reports disclosed to defense counsel before trial state the following:

> The below is an interview summary. It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties in the interview room were electronically recorded. The recording captures the actual words spoken.

Doc. 126-1. Based on this information, defense counsel should have known that a recording existed which might not be entirely consistent with the written report. Because defense counsel appeared not to make efforts to seek the audio recording before the trial began, the recordings are hard to consider "newly discovered." Castillo, 171 F.3d at 1167 (finding that due diligence requires a defendant to make some effort to discover the evidence).

Moreover, having conducted its in camera review, this Court finds the audio recordings to be substantially similar to the written summaries provided. The additional information that the audio recordings contain beyond the written summaries is not material to Erickson's defense. In fact, most of the additional references to Erickson in the recordings provide further evidence of his

illegal activities. Nothing Witness C relates in those recordings provides exculpatory information about Erickson's involvement in the conspiracy to distribute methamphetamine, and the written reports provided to Erickson before trial fairly summarize what Witness C said. Because the recordings not previously disclosed to Erickson do not contain exculpatory evidence, nothing in the recordings would likely lead to an acquittal if a new trial were granted. Therefore, Erickson is not entitled to a new trial based on newly discovered evidence. See Castillo, 171 F.3d at 1167.

### D. Witness JS Testimony

Witness JS was subpoenaed for trial and did not initially appear. This Court issued a material witness warrant at the government's request, and the United States Marshal Service took Witness JS into custody. Witness JS spent the night in United States Marshal Service custody and then testified the following day. The defense attorney postulated that Witness JS was under the influence at the time of his testimony, but this Court thought otherwise. Typically, "[c]ompetency of the witness is a matter of discretion with the trial judge." United States v. Stout, 599 F.2d 866, 869 (8th Cir. 1979) (per curiam). This Court nevertheless allowed defense counsel to recall Witness JS and ask whether he would be willing to take a urinalysis test that day. Witness JS responded that he would not. The defense attorney did not ask further questions at that point.

It is for the jury of course to determine whether to credit testimony of a witness or not. See United States v. Dabney, 367 F.3d 1040, 1043 (8th Cir. 2004) (explaining the "jury's unique rule in judging the credibility of witnesses"). Witness JS's testimony that he bought small amounts of methamphetamine from Erickson and that Erickson had wanted him to sell methamphetamine contradicted Erickson's testimony, but was consistent with other witnesses' testimony concerning Erickson's methamphetamine-related activities. Furthermore, defense counsel's questioning of Witness JS provided the jury with information regarding the witness's possible recent drug use to

allow the jury to determine his credibility and to adequately weight his testimony. Erickson is not entitled to a new trial simply because Witness JS testified or simply because this Court declined to instruct the jury to disregard Witness JS's testimony.

### E. Argument Concerning Verdict Being Against the Great Weight of Evidence

Erickson makes essentially two arguments to justify acquittal or new trial based on the verdict being against the weight of the evidence. Erickson argues that Witness C was not credible and could not be believed by any reasonable jury. Erickson also argues that there was no evidence of an agreement sufficient to establish a conspiracy.

As to the credibility of Witness C, it is for the jury to evaluate credibility, and the defense attorney subjected Witness C to active cross-examination. See United States v. Gaona-Lopez, 408 F.3d 500, 505 (8th Cir. 2005) ("The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy.") (citation omitted); see also Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of [her] testimony are tested."). The jury observed Witness C's demeanor on both direct and cross examination and had ample opportunity to assess her credibility The jury's verdict finding the conspiracy to involve 500 grams or more of methamphetamine suggests it credited Witness C's testimony, although the drug weights from the other seven witnesses who testified about Erickson's involvement in methamphetamine distribution separately add up to slightly in excess of 500 grams.

As for the existence of a conspiracy, the testimony, if believed, established that Erickson was involved in methamphetamine distribution with at least eight other individuals. "In a drug conspiracy case ... the government is not required to present direct evidence of an explicit agreement; juries may rely upon circumstantial evidence to discern a tacit agreement or

understanding between the co-conspirators." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010). Once the government proves that a conspiracy existed, "only slight evidence is required to connect a defendant to the conspiracy." United States v. Hayes, 391 F.3d 958, 961 (8th Cir. 2004). While there was no testimony regarding some written agreement, the testimony was sufficient from which the jury could discern the existence of a conspiracy involving Erickson in which the jury could have reasonably foreseen 500 grams or more of methamphetamine to be distributed. Witness C testified that she repeatedly delivered multiple pounds of methamphetamine to the Rosebud Indian Reservation where she would split it with Erickson, he would sell his portion, and then he would pay Witness C for the methamphetamine from his sales. Witness R testified about Erickson buying and selling methamphetamine and saw him possess and distribute amounts of the drug. Witness MB testified that he would repeatedly sell distributable amounts of methamphetamine to Erickson. Others, including Witness TE, Witness AB, Witness W, Witness JS, and Witness G, testified about Erickson's involvement in other purchases and sales of methamphetamine. The testimony of these witnesses provides sufficient circumstantial evidence from which the jury could find a conspiracy to distribute methamphetamine. See United States. v. Conway, 754 F.3d 580, 588 (8th Cir. 2014) ("Evidence of multiple sales of resale quantities of drugs is sufficient in and of itself to make a submissible case of a conspiracy to distribute.") (cleaned up and citation omitted). Erickson makes no argument in his post-trial motion that this Court improperly instructed the jury on what constitutes a conspiracy. The jury reasonably could have believed those who testified about Erickson's involvement in the distribution of methamphetamine. Erickson has not met the standard either for acquittal or for a new trial, and there exists evidence to support the jury's verdict on Count 1.

**III.    Conclusion**

For the reasons contained herein, it is hereby

ORDERED that Erickson's Motion for Acquittal or in the Alternative New Trial, Doc. 118, is denied.

DATED this 28th day of January, 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE